No. 2--04--1161    Filed: 4-20-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--CF--3090 |
| | ) ) | Honorable |
| KEBRON R. DENNIS, | ) ) | James K. Booras and John T. Phillips, |
| Defendant-Appellant. | ) | Judges, Presiding. |

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a jury trial, defendant, Kebron R. Dennis, was found guilty of attempted first-degree murder (720 ILCS 5/8--4(a), 9--1(a)(1) (West 2002)) and aggravated battery with a firearm (720 ILCS 5/12--4.2(a)(1) (West 2002)) and sentenced to 21 years' imprisonment. Defendant raises three contentions on appeal: (1) that the trial court erred when it denied his motion to suppress statements; (2) that the trial court erred when it denied his motion in limine seeking to introduce evidence of the victim's propensity and reputation for violence and aggressiveness; and (3) that he is entitled to two additional days' credit against his sentence, for the time he spent in pretrial custody. We vacate defendant's conviction and sentence, and we remand the case for a new trial.

On September 10, 2003, defendant was charged by indictment with the offenses of attempted first-degree murder (720 ILCS 5/8--4(a), 9--1(a)(1) (West 2002)) and aggravated battery with a

firearm (720 ILCS 5/12--4.2(a)(1) (West 2002)). The indictment alleged that, on August 24, 2003, defendant shot and injured the victim, Curtis Mitchell, with a handgun.

On October 3, 2003, defendant filed a motion to suppress the statements he made to police after his arrest. Specifically, defendant argued that the statements he made while being treated at St. Therese Hospital were involuntary and were made prior to the receipt of <u>Miranda</u> warnings. Defendant also argued that the statements he later made at the Waukegan police station should have been suppressed as "the fruit of the poisonous tree."

On October 29, 2003, defendant raised the affirmative defense of self-defense and presented evidence, by way of his written statement, tending to support that theory.

On May 21, 2004, the trial court conducted a hearing on defendant's motion to suppress statements. At the hearing, the trial court took judicial notice of the testimony that Waukegan police detective George Valko had given at an earlier pretrial hearing. Valko had testified that, on August 24, 2003, at approximately 11:50 p.m., he heard a radio dispatch that there were "possible shots fired" at 905 Baldwin in Waukegan. As Valko responded to the call, he heard another radio dispatch identifying as a possible suspect "a male black subject" in a "red Cadillac," leaving the scene. Valko testified that he observed a red Cadillac, with its lights off, in an alley behind a Jewel store. Valko testified that the Cadillac pulled out of the alley and began driving on Green Bay Road. Valko activated his lights and siren and called for backup. While he was following the vehicle, Valko observed the driver stick his left arm out the driver's side window and throw something shiny over the top of the vehicle into the marsh-like parkway along Green Bay Road. Valko testified that Green Bay Road is unpopulated in that area. Valko testified that, after backup officers arrived, they conducted a felony traffic stop of the vehicle. Valko ordered the driver, identified as defendant, to

step out of his vehicle, step back toward the officers, and kneel on the ground. Defendant was arrested and handcuffed. Valko testified that defendant was bleeding from the leg, and an ambulance was called to transport defendant to the hospital. After defendant was taken to the hospital, Valko remained at the scene for two hours with other officers, searching for the object that was thrown from defendant's vehicle. Valko testified that the police never recovered the object.

The trial court also took judicial notice of the testimony that Waukegan police officer Donald Paulsen had given at an earlier pretrial hearing. Paulsen had testified that, on August 24, 2003, shortly before midnight, he was on duty as a patrol officer and evidence technician. Paulsen testified that, when he arrived at the scene of defendant's traffic stop, defendant was still seated in his vehicle. Paulsen observed "from a distance, a large amount of blood" on defendant's upper hip and thigh area. Paulsen also observed pooling of blood on the ground after defendant knelt at Valko's request. Paulsen testified that, after defendant left in the ambulance, he searched defendant's vehicle. He observed a black ski mask on the floorboard behind the driver's seat and a ripped, bloody T-shirt in between the two front seats. Paulsen searched defendant's vehicle after it had been towed to the police station. He recovered what appeared to be a single .22- or .25-caliber bullet from under the driver's seat.

Waukegan police detective Larry Holman testified that he had been a detective for nine years and that he was the lead investigator of the shooting that occurred at 905 Baldwin in Waukegan on August 24, 2003. Holman testified that, at the time he left the police station just after midnight to begin his investigation, he knew that both the victim and defendant had sustained gunshot wounds and were being transported to St. Therese Hospital for treatment. Holman testified that he and his

partner, Waukegan police detective Timothy Buckingham, arrived at the hospital at approximately 1 a.m. At this time, the victim was being treated for his injuries and defendant had not yet arrived.

Holman further testified that defendant arrived at the emergency room at approximately 1:30 a.m. Holman testified that he entered defendant's curtained-off area "as soon as" the nurses left. Holman testified that defendant was "very calm and quiet." Defendant was clothed only in his underwear, and he had what appeared to be a bullet wound "through-and-through" his upper thigh. The injury was not bandaged, and defendant was still bleeding from the wound. Holman testified that he repeatedly asked defendant if he knew the location of the gun used in the shooting. Defendant did not respond to the questions. Holman continued to ask defendant "where the gun was," "what did he do with the gun," and "did he know what happened to the gun." Defendant responded, "I don't know where the gun is." Holman asked defendant "several more times" about the location of the gun. Holman testified that defendant then became visibly upset and began to cry. Holman asked defendant "if he was okay, what was wrong." Defendant responded that the victim used to be his friend and that they had been coworkers at Comcast. Defendant then told Holman that he had been to the victim's apartment earlier that evening. Defendant stated that the victim had "ruined his life, his soul, and his marriage." Defendant related that the victim was sleeping with defendant's wife and that he was worried that he was going to lose his children. Defendant ended by saying that everything was "going to be downhill from here." Holman testified that he asked defendant once more about the location of the gun before a nurse told Holman to leave so that she could continue defendant's treatment. Holman was with defendant for approximately 10 minutes and he did not give defendant Miranda warnings. During Holman's testimony, the State stipulated that defendant had not been given Miranda warnings prior to Holman's questioning.

Holman further testified that, following defendant's release from the hospital, he was transported to the police station and placed in an interrogation room at approximately 4:30 a.m. on August 25, 2003. When Holman and Buckingham entered the interrogation room, Holman asked defendant if he needed anything to drink or needed to use the bathroom. Defendant said he did not need anything. Holman testified that he read defendant the Miranda warnings from a preprinted form and that defendant signed the form and agreed to speak with them. Holman did not testify as to what he specifically asked defendant during the interview.

Holman testified that defendant did not want to write out a statement, but he agreed to let Holman type a statement for him to sign. The statement contained the following description of the events of August 24, 2003. Defendant and the victim knew one another through work and had socialized outside of work. Defendant suspected his wife and the victim were having an affair. Defendant's "life was in a shambles," as he was having marital problems. Defendant was worried about losing custody of his children. Defendant went to the victim's apartment building to confront the victim and to "see what was up," but he did not plan to kill the victim. Defendant had a mask and a gun. The victim surprised defendant when the victim came running out of the apartment building with "a big silver knife." Defendant shot the victim as the victim was "coming at" defendant with the silver knife. The victim took defendant's gun and shot defendant in the leg. Defendant ran out of the apartment building and drove off.

On cross-examination, Holman denied knowing that defendant was in police custody at the time he spoke to him in the hospital. Holman admitted that he had spoken with several other officers and with the victim prior to speaking with defendant in the hospital. Holman also admitted that the victim told him that defendant had a black ski mask and that defendant was the person who had shot

him. Holman admitted that he did not ask medical personnel if he could speak with defendant and that he did not know if defendant had received medication prior to the time he questioned him. Holman also admitted that it appeared to him that defendant's wounds had not been fully treated. Holman testified that, at some point during the questioning, defendant affirmatively said that he did not know where the gun was. Holman admitted that, despite this response, he continued to question defendant. Holman denied basing defendant's written statement on the information he received from the victim and defendant in the hospital. He also denied typing the statement prior to defendant's arrival at the police station. Holman testified that the information contained in defendant's written statement was derived from the interrogation at the police station, after defendant had received Miranda warnings.

The State next called Buckingham. Buckingham testified that sometime after midnight on August 25, 2003, he and Holman were called to investigate a shooting at 905 Baldwin in Waukegan. Buckingham testified that he was aware that defendant had been taken into custody before he and Holman arrived at the hospital at approximately 12:20 a.m. They spoke with the victim for approximately 30 to 45 minutes. Buckingham testified that near the end of the interview with the victim, Holman left to speak with defendant. Buckingham testified that he did not participate in the interview of defendant.

Buckingham testified that, sometime between 2 and 4:30 a.m. at the police station, he and Holman had a conversation in which Holman indicated that he was unable to learn the location of the gun involved in the shooting during his interview of defendant at the hospital. Buckingham denied that Holman discussed any other statements made by defendant during the hospital interview. Buckingham further testified that, at approximately 4:30 a.m., he and Holman interrogated defendant

at the police station and that Holman read defendant <u>Miranda</u> warnings from a preprinted form.

Defendant stated that he understood his rights, and he signed a waiver form. Buckingham testified

that defendant agreed to speak with them and that the interrogation lasted less than one hour. He

testified that Holman typed a summary of defendant's statements and read the typewritten statement

to defendant. Buckingham testified that defendant said the statement was correct before signing it.

On cross-examination, Buckingham admitted that, during the police station interrogation,

Holman asked defendant questions relating to the statements he made earlier at the hospital.

Specifically, Holman asked defendant questions about how the victim had ruined defendant's life and

marriage. Holman also asked defendant questions about the victim sleeping with defendant's wife

and about defendant's concerns regarding the custody of his children. Buckingham testified that

those subjects had not previously been discussed by defendant during the police station interrogation,

nor had they been discussed in the interview of the victim at the hospital. Buckingham testified that,

at the time, he did not know where Holman had obtained the information. Buckingham also testified

that defendant never said "my life is in shambles" during the questioning at the police station, even

though that statement was included in the written statement prepared by Holman.

Following the arguments of the parties, the trial court denied defendant's motion to suppress

statements. The trial court found that, although defendant's interview at the hospital was a custodial

interrogation, <u>Miranda</u> warnings were not required, as the public safety exception applied. The trial

court found that all of Holman's questioning of defendant at the hospital was necessary to determine

the location of the gun. The trial court also found that defendant's statements at the hospital were

not the product of coercion, but were voluntarily given. As to the statements defendant gave at the

police station, the trial court found that defendant voluntarily waived his <u>Miranda</u> rights and that the

statements were given freely and voluntarily. In weighing the witnesses' credibility, the trial court stated, "I do believe the officers' testimony," and found that the statements at the police station were not "in anyway connected or tainted" by the statements made at the hospital. Therefore, the trial court ruled that all of defendant's statements were admissible at trial.

On July 7, 2004, defendant filed a motion in limine in which he sought to introduce evidence at trial regarding the victim's "conduct and reputation for violence and aggressiveness." Specifically, defendant sought to: (1) question the victim and the victim's wife regarding a domestic violence complaint filed by the wife against the victim, but which was not prosecuted; (2) question the victim and testify himself as to physical altercations the victim had with other employees at Comcast; and (3) testify himself as to the victim's reputation among his coworkers as a violent and aggressive individual. Defendant argued that all of the evidence would be offered to show that the victim was the initial aggressor, and to show defendant's state of mind, i.e., that defendant reasonably believed that he needed to defend himself with deadly force against the victim's attack with a knife.

Following arguments of the parties, the trial court denied the motion in limine in part. With respect to the introduction of evidence regarding the domestic violence complaint and the victim's reputation for violence among his coworkers, the trial court ruled, "I do not find any *** legal ground for allowing this type of evidence. *** I will not allow evidence that is not permitted by any rules [sic] of evidence or not permitted by any case law." The trial court reserved its ruling on the motion with respect to the introduction of defendant's own testimony as to his knowledge and state of mind as to the victim's propensity for violence and aggressiveness. The trial court reserved its ruling so that defense counsel could provide it with case law supporting the motion. The case was transferred to another judge and no further order was entered on the motion prior to trial.

Trial commenced on August 24, 2004. Waukegan police officer Santiago Lopez testified that he was working as a patrolman on the evening of August 24, 2003. Lopez testified that he was responding to the report of a shooting at 905 Baldwin when he observed a red Cadillac turn off of Baldwin and onto Grand Avenue. Lopez reported the vehicle's location and proceeded to the scene of the shooting. Lopez testified that the victim reported that he had been shot by defendant. Lopez observed a wound in the victim's lower chest and another wound in the victim's upper stomach. After an ambulance arrived, Lopez searched outside of the apartment. He located a knife under a bush close to the sliding glass doors of the victim's apartment.

Holman's trial testimony was substantially consistent with his testimony at the suppression hearing except for the following statements. Holman testified that, when defendant became upset at the hospital and began to cry, Holman asked defendant "[w]hat was wrong, if he was okay." Holman testified that defendant responded that the victim "ruined my life." Holman then asked defendant "what he meant by that." Holman testified, "Defendant said [the victim] 'ruined my life, my soul, and my marriage' and that's all he would say."

The State also presented the testimony of Paulsen, Buckingham, and Valko. Their testimony was substantially consistent with that given at the hearing on defendant's motion to suppress.

The victim testified that he and his wife were watching a movie in their apartment at approximately 11:30 p.m. when he heard a sound that caused him to look toward the patio door. He saw a shadow move across the door. The victim testified that he told his wife he thought there might be "some kids" out by his car, and that he was going "outside to take a look around." The victim's car was parked just outside the patio door to his apartment. The victim testified that he retrieved his pocket knife and went out to the parking lot. The victim testified that some bushes were "shaking

profusely" at the south end of the parking lot, and he walked in that direction. The victim testified that someone wearing a black mask, black gloves, a black shirt, black pants, and black shoes jumped out of the bushes. The victim testified that, as he turned to run back into the apartment, he was shot. The victim testified that the shooter was standing on a 4-foot wall, approximately 10 to 12 feet away from the victim, at the time he fired the shot. The victim testified that the masked individual climbed off the wall and began running after him.

The victim further testified that the shooter tackled him to the ground near the patio door to his apartment. The victim testified that he dropped his knife and began struggling to get the gun. During the struggle, the victim ripped the mask off of the gunman and recognized defendant. The victim testified that defendant dropped the gun and that the victim grabbed the gun. He shot defendant in the upper thigh area. The victim testified that defendant then collapsed on top of him, and the gun was dislodged from his grasp. Defendant retrieved the gun.

The victim testified that defendant ordered him into the apartment at gunpoint. The victim testified that he then ran to his apartment, knocked, and yelled to his wife to open the door and to call the police. The victim testified that defendant tried to force his way into the apartment. The victim pushed defendant out of the doorway and shut and locked the door. According to the victim, the entire altercation lasted less than 10 minutes.

The victim further testified that he had known defendant for more than two years as a coworker and that they had a good working relationship. The victim testified that he and defendant went to another coworker's birthday party together on August 9, 2003, and that they occasionally went out for a beer. The victim denied that he called defendant to come to his apartment on August

24, 2003. The victim testified that he never saw defendant or anyone else at Comcast wear a mask in the course of his or her work.

On cross-examination, the victim testified that he took the knife outside with him because he thought there may be a threat to his safety, not because there may be children around his car. The victim denied that he pulled defendant's shirt over his head during their struggles.

Defendant testified that, in August 2003, he worked at Comcast as a lineman. He testified that he has a skin pigmentation disorder and that he often wore a mask to protect himself while working. Defendant testified that he had previously worn a mask while working with the victim. Defendant testified that the mask had been in his vehicle on numerous occasions when the victim had also been in the vehicle. Defendant denied wearing the mask on the evening of August 24, 2003. He testified that he kept a .22-caliber handgun in his toolbox because he had been attacked in the past and because he often worked in dangerous areas.

Defendant testified that he had worked with the victim at Comcast for 2½ years prior to the shooting. He testified that he and the victim often had lunch together and that the victim had been to his home no less than 15 times. He testified that, on the Saturday prior to the shooting, he and the victim were in the Comcast parking lot after work and the victim told him that he wanted to speak with him sometime over the weekend. Defendant testified that the victim would not tell him what the subject was, just that "[i]t's nothing we need to say here." Defendant testified that the victim called him on his cellular telephone late in the evening on Sunday, August 24, 2003, and asked defendant to come to his apartment to speak with him.

Defendant further testified that he tucked his gun into the waistband of his pants when he got to the victim's apartment complex, because it was a dangerous area and because he "knew that this

guy basically was who he was." Defense counsel then asked defendant, "Prior to that evening did you have any knowledge of [the victim's] propensity for violent acts?" Defendant answered, "Yes, I did." The State objected and the trial court sustained the objection. Defense counsel then asked defendant what his intentions were as he was walking up to the apartment. The State objected and the trial court sustained the objection. Defense counsel asked defendant what he was thinking at that moment. The State objected and the trial court sustained the objection.

Defendant further testified that, as he walked up to the foyer door leading into the victim's apartment building, the victim was waiting for him just inside the door. As defendant got close to the door, the victim ran out and lunged at him with the knife, cutting the right sleeve of his shirt near the shoulder. Defendant testified that, within a second, the victim grabbed him and pulled his shirt over his head so that he could not see. The victim began punching him repeatedly. Defendant testified that he grabbed his gun and shot while his shirt was still over his head. Defendant testified that, at the time he shot the gun, he believed that the victim was trying to kill him. Defendant testified that he and the victim continued to struggle. During the struggle, the victim got ahold of defendant's gun and shot him in the leg. Defendant testified that he and the victim continued to struggle and that defendant tried to stop the victim from reaching the gun or the knife, which were both on the ground. Defendant testified that eventually he got away from the victim and ran to his vehicle.

Defendant testified that he was driving himself to the hospital when the police started following him. Defendant testified that he threw a lit cigarette out of the window of the vehicle while he was being followed by the police. He denied throwing a gun out of the vehicle window and testified that the last time he saw the gun it was on the ground at the apartment complex.

On cross-examination, defendant testified that he was kept at the scene of the traffic stop for more than an hour before he was treated or transported by the paramedics to the hospital. When asked why he signed a statement that said that he had a mask on the evening in question, defendant testified that he told the police officers the statement was not entirely accurate and that he signed it because he was exhausted and he just wanted the interrogation to end.

On August 27, 2004, the jury found defendant guilty of attempted murder and aggravated battery with a firearm. On November 10, 2004, following a sentencing hearing, the trial court merged the aggravated battery conviction into the attempted murder conviction and sentenced defendant to 21 years' imprisonment. Defendant timely appeals.

Defendant first contends that the trial court erred when it denied his motion to suppress the statements he made to police in the emergency room and at the police station. Defendant argues that the trial court improperly determined that the statements he gave at the hospital were admissible under the public safety exception to Miranda. Defendant further argues that his statements at the hospital were inadmissible because they were obtained prior to his receiving Miranda warnings and because they were otherwise involuntarily given. Specifically, defendant argues that his statements at the hospital were obtained after he had suffered trauma and had lost a large amount of blood. Defendant argues that at the time he made the statements at the hospital, he was medicated and receiving treatment for a gunshot wound, and that Holman made no inquiry into his medical state prior to the hospital interrogation. Defendant additionally argues that, since his statements at the hospital were illegally obtained, the statements he later made at the police station should also have been suppressed under the "fruit of the poisonous tree" doctrine.

Review of a trial court's ruling on a motion to suppress involves a mixed question of law and fact. See People v. Pitman, 211 Ill. 2d 502, 512 (2004). In reviewing a suppression ruling, we consider both the evidence submitted at the suppression hearing and the evidence submitted at trial. People v. Kveton, 362 Ill. App. 3d 822, 830 (2005). Findings of historical fact made by the trial court will be upheld on review unless such findings are against the manifest weight of the evidence. Pitman, 211 Ill. 2d at 512. We do undertake, however, our own assessment of the facts in relation to the issues presented, and we draw our own conclusions with regard to the relief that should be granted. Pitman, 211 Ill. 2d at 512. Therefore, we review de novo the ultimate question of whether to grant the motion to suppress. Pitman, 211 Ill. 2d at 512.

The fifth amendment to the United States Constitution (U.S. Const., amend. V) and article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I, §10) guarantee that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." In Miranda v. Arizona, 384 U.S. 436, 475-77, 16 L. Ed. 2d 694, 724-25, 86 S. Ct. 1602, 1628-29 (1966), the United States Supreme Court extended the fifth amendment privilege against self-incrimination to custodial interrogation and required that a defendant be warned that he or she has the right to remain silent, he or she has the right to an attorney, and that any statement given may be used against him or her in a court of law. Under Miranda, a statement taken from a defendant is inadmissible in the State's case unless the State demonstrates, by a preponderance of the evidence, that the defendant was first given Miranda warnings and that the defendant made a knowing and intelligent waiver of his or her privilege against self-incrimination. People v. Cook, 352 Ill. App. 3d 105, 120 (2004); People v. Laliberte, 246 Ill. App. 3d 159, 165 (1993).

However, the United States Supreme Court has enunciated limited exceptions to the Miranda warning requirement. One exception is where the police face an immediate threat to public safety. New York v. Quarles, 467 U.S. 649, 655-57, 81 L. Ed. 2d 550, 556-58, 104 S. Ct. 2626, 2631-32 (1984). In that instance, officers may ask questions necessary to secure the safety of the public or themselves prior to issuing Miranda warnings. Quarles, 467 U.S. at 655-57, 81 L. Ed. 2d at 556-58, 104 S. Ct. at 2631-32.

In the present case, there is no question, and the State stipulated, that defendant had been in custody since the traffic stop just before midnight and that he had not received Miranda warnings prior to the statements he made at the hospital at approximately 1:30 a.m. We disagree with the State's contention and the trial court's ruling that the Quarles public safety exception excused the police from giving defendant Miranda warnings prior to speaking with him at the hospital. Quarles, 467 U.S. at 655-57, 81 L. Ed. 2d at 556-58, 104 S. Ct. at 2631-32.

In Quarles, the police apprehended a suspected rapist, who had been armed with a gun, in a supermarket. Quarles, 467 U.S. at 652, 81 L. Ed. 2d at 554, 104 S. Ct. at 2629. During a pat-down search, an officer discovered that the defendant was wearing an empty shoulder holster. The officer asked the defendant about the location of the weapon, prior to giving Miranda warnings. The defendant responded that the gun was in a nearby empty carton. The Court held that the defendant's statement and the gun were admissible despite the officer's failure to provide Miranda warnings prior to questioning the defendant about the gun. Quarles, 467 U.S. at 659, 81 L. Ed. 2d at 559, 104 S. Ct. at 2633. The Court noted that the gun posed a danger to public safety because a customer or an employee may have come upon the gun in the busy store. Quarles, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632. The Court noted that the police officer asked about the gun after having just

apprehended the defendant and that he was confronted with the immediate necessity of ascertaining the whereabouts of a weapon that he believed the defendant had just removed from the holster and discarded in the supermarket. The Court described the exigent circumstances under which the public safety exception would apply as those where the police are required to make a decision "in a matter of seconds," "in a kaleidoscopic situation" where "spontaneity *** is necessarily the order of the day." Quarles, 467 U.S. at 656-58, 81 L. Ed. 2d at 557-58, 104 S. Ct. at 2631-32. The Court found that requiring the police to recite the Miranda warnings under such circumstances would put the police in the untenable position of having to make a decision as to whether to ask the question without the warnings and render the probative evidence inadmissible, or give the warnings and possibly deter the defendant from giving the information needed to neutralize a volatile situation. Quarles, 467 U.S. at 657-58, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632.

In reaching its holding, the Court in Quarles distinguished Orozco v. Texas, 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969), as a case in which the public safety exception was inapplicable because exigent circumstances did not exist. Quarles, 467 U.S. at 659 n.8, 81 L. Ed. 2d at 559 n.8, 104 S. Ct. at 2633 n.8. In Orozco, four hours after a murder had been committed at a restaurant, four police officers entered the defendant's boarding house and awakened him. Orozco, 394 U.S. at 325, 22 L. Ed. 2d at 314, 89 S. Ct. at 1096. Without giving Miranda warnings, the officers began asking the defendant repeatedly about whether he owned a gun. The defendant admitted that he had been at the scene of the shooting and directed the officers to a washing machine in the boarding house, where he had hidden the gun. The Court found that the questions about the gun were not justified by an objectively reasonable need to protect the police or the public from an immediate danger. "In short there was no exigency requiring immediate action by the officers

beyond the normal need expeditiously to solve a serious crime." Quarles, 467 U.S. at 659 n.8, 81 L. Ed. 2d at 559 n.8, 104 S. Ct. at 2633 n.8. Accordingly, the Orozco Court held that the gun and all of the defendant's statements in the boarding house should have been suppressed. Orozco, 394 U.S. at 326, 22 L. Ed. 2d at 314, 89 S. Ct. at 1096-97.

With these authorities in mind, we turn now to the facts presented in the instant case. We find the facts of the instant case analogous to Orozco and distinguishable from Quarles. The police were not "in the very act of apprehending" defendant as they were in Quarles. See Quarles, 467 U.S. at 657, 81 L. Ed. 2d at 557, 104 S. Ct. at 2632. Instead, Holman approached defendant 90 minutes after he had been taken into custody, as he lay in his hospital bed, similar to the sleeping defendant in Orozco. See Orozco, 394 U.S. at 325, 22 L. Ed. 2d at 314, 89 S. Ct. at 1096. There was no "volatile" situation at this point. Quarles, 467 U.S. at 658, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632. The investigation had been underway for an hour and a half. Defendant had been arrested, both the victim and defendant had been transported to the hospital and were being treated for their injuries, and the victim had already given a 30- to 45-minute statement to the police. Simply stated, there was no longer an "objectively reasonable need to protect the police or the public from any immediate danger" at that point. Quarles, 467 U.S. at 659 n.8, 81 L. Ed. 2d at 559 n.8, 104 S. Ct. at 2633 n.8.

Additionally, the police in the instant case were not confronted with a situation where the defendant had "just" discarded a weapon in a crowded or populated area. See Quarles, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632. Indeed, at the time Holman questioned defendant, he was aware that officers were searching for a gun that Valko thought he observed being tossed out into the unpopulated, marsh-like area along Green Bay Road approximately 90 minutes earlier. See Orozco, 394 U.S. at 325, 22 L. Ed. 2d at 314, 89 S. Ct. at 1096. As in Orozco, at the time Holman

questioned defendant at the hospital, there were no exigent circumstances requiring immediate action beyond the normal need to solve a serious crime expeditiously. See Orozco, 394 U.S. at 325, 22 L. Ed. 2d at 314, 89 S. Ct. at 1096. Additionally, this was not an instance of the police asking the defendant a single time where the weapon was and receiving a response, as was the case in Quarles. See Quarles, 467 U.S. at 656-58, 81 L. Ed. 2d at 557-59, 104 S. Ct. at 2631-33. Rather, as in Orozco, Holman questioned defendant repeatedly for nearly 10 minutes about the location of the gun. See Orozco, 394 U.S. at 325, 22 L. Ed. 2d at 314, 89 S. Ct. at 1096. Therefore, we hold that none of Holman's questioning at the hospital was permitted under the public safety exception.

Moreover, even if we were to assume that Holman's initial question at the hospital about the gun was appropriate under the public safety exception, Holman's questions concerning defendant's state of mind nearly 10 minutes later, and after defendant became visibly upset and began to cry, were not probative of the weapon's location and, therefore, neither the questions nor the responses fall under the public safety exception. See Quarles, 467 U.S. at 656-58, 81 L. Ed. 2d at 557-59, 104 S. Ct. at 2631-33. Once defendant affirmatively told Holman that he did not know where the gun was, the rationale for the public safety exception no longer supported Holman's continued questioning of defendant about the weapon or any other matter without giving him Miranda warnings. Quarles, 467 U.S. at 655-57, 81 L. Ed. 2d at 556-58, 104 S. Ct. at 2631-32. In other words, when defendant said he did not know where the gun was, the Miranda warnings would not have "deterred" defendant from giving the information that defendant had just communicated he did not have. See Quarles, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632. Accordingly, for all of these reasons, we determine that the trial court erred in finding that defendant's hospital statements were admissible under the public safety exception.

We also find erroneous the trial court's conclusion that defendant's statements at the hospital were otherwise voluntarily given. As defendant notes, the State has the obligation to establish, by a preponderance of the evidence, that a statement is voluntary. 725 ILCS 5/114--11(d) (West 2004); People v. Nicholas, 218 Ill. 2d 104, 118 (2005). Defendant argues that, under the totality of the circumstances, his will to remain silent was overborne due to his physical condition at the time and due to the nature of the interrogation without his having received Miranda warnings.

To determine whether a statement was voluntary, we consider the totality of the circumstances. Nicholas, 218 Ill. 2d at 118. Factors to be considered in our determination include the defendant's age, intelligence, education, experience, and physical condition at the time of the interrogation; the duration of the interrogation; whether the defendant received Miranda warnings prior to giving the statement; whether physical or mental abuse was employed against the defendant; and the legality and duration of the detention. Nicholas, 218 Ill. 2d at 118. Where it appears that the circumstances were such that the defendant's will to remain silent was inappropriately overborne, the statement will be deemed involuntary. See People v. Stone, 61 Ill. App. 3d 654, 663 (1978) (finding that an involuntary confession requires reversal regardless of other evidence sufficient to support conviction).

In the instant case, defendant's precise mental and physical condition at the time of the interrogation at the hospital is not revealed by the record. The State presented no evidence to establish whether defendant had received medical treatment for his injuries, or whether he was under the influence of medication or in shock at the time Holman interrogated him in the emergency room.

To the contrary, Holman admitted that he did not ask any attending medical personnel for permission to interview defendant. Holman also admitted that he did not consult with medical personnel to determine whether defendant was able to understand or answer his questions. Holman testified that he "took the first opportunity" after the nurses left defendant unattended to begin his questioning and that he was not aware whether defendant had been given medication in the ambulance or at the hospital. Holman admitted that defendant's leg had what appeared to be an entry and exit gunshot wound that had not yet been bandaged and that was still bleeding at the time he began his interrogation. Cf. People v. Williams, 181 Ill. 2d 297, 310-11 (1998) (finding that the State met its burden in establishing that defendant's medical condition after being shot did not render his statement involuntary where medical personnel testified that defendant was in stable condition, had not received medication, was not in shock, and was no longer bleeding).

Furthermore, as discussed above, Miranda warnings were not given at any time prior to the statements made by defendant at the hospital. The length of the interrogation was approximately 10 minutes, a significant amount of time given the fact that one question was asked over and over again. Holman testified that he repeatedly asked defendant if he knew where the gun used in the shooting was and that defendant was calm and sedate and initially did not respond to the questions. Holman continued to ask defendant "where the gun was," "what did he do with the gun," and, "did he know what happened to the gun," until defendant responded, "I don't know where the gun is." Holman admitted that he asked defendant "several more times" about the location of the gun until defendant became visibly upset and began to cry. The change in defendant's demeanor suggests that his will

-20-

to remain silent was overborne. See People v. Harbach, 298 Ill. App. 3d 111, 117-18 (1998) (finding that a 5- to 10-minute interval between defendant's refusal to speak with police and the officers' next attempt to speak with defendant was an indication that defendant's "resolve" to remain silent was overborne). Holman then asked defendant if he was alright and asked him to elaborate on the statement, "Curtis ruined my life." Defendant responded by making five additional statements that went to a possible motive for the shooting. Given defendant's unknown medical condition, the intensity of the questioning over a period of 10 minutes, the absence of Miranda warnings, and the visible change in defendant's demeanor from the time Holman first began his interrogation to the time defendant made the statements, we conclude that the State failed to meet its burden and that the trial court erred in finding that defendant's statements were voluntary under the totality of the circumstances. See Harbach, 298 Ill. App. 3d at 117-18. For all of these reasons, we conclude that the trial court erred in denying defendant's motion to suppress all of the statements he made at the hospital.

Defendant next contends that the trial court erred in denying his motion to suppress the oral and written statements he made at the police station. Defendant argues that the statements made at the police station were obtained as a direct result of the statements made at the hospital. Defendant argues that, because the hospital statements were obtained illegally, the statements made at the police station must also be suppressed under the "fruit of the poisonous tree" doctrine. See People v. White, 117 Ill. 2d 194, 222 (1987), citing Wong Sun v. United States, 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453, 83 S. Ct. 407, 415-16 (1963); Laliberte, 246 Ill. App. 3d at 166. The State responds

that the statements made at the police station were sufficiently attenuated from the statements made at the hospital so as to have "purged" any alleged taint from the prior questioning.

The exclusionary rule requires that evidence obtained as a direct result of an illegal interrogation be inadmissible at trial. See White, 117 Ill. 2d at 222; Laliberte, 246 Ill. App. 3d at 166. The rule prohibits the admission of evidence obtained by means of an unlawful act by the police unless the chain of causation proceeding from the unlawful conduct has become attenuated or has been interrupted by some intervening circumstance, so as to remove the "taint" imposed upon that evidence by the original illegality. White, 117 Ill. 2d at 222. Consequently, the evidence must be suppressed unless it was "attenuated," or obtained by means sufficiently distinguishable from the unlawful conduct that it was purged of the taint of that illegality. White, 117 Ill. 2d at 222. The four factors we consider in determining whether a statement was the product of illegal police action include: (1) whether Miranda warnings were given; (2) the presence of intervening circumstances; (3) the proximity in time between the illegal police action and the statement or the confession; and (4) the purpose and flagrancy of the police misconduct. People v. Morris, 209 Ill. 2d 137, 157 (2004). The question of whether a statement has been obtained by the exploitation of a prior illegal police action must be answered based on all of the facts of each case, and no single factor is dispositive. Morris, 209 Ill. 2d at 157. The State bears the burden of demonstrating, by clear and convincing evidence, sufficient attenuation of the evidence obtained through police misconduct. Morris, 209 Ill. 2d at 157-58.

The first factor to be considered in determining the admissibility of a statement given subsequent to an illegal police action is whether a defendant received <u>Miranda</u> warnings prior to being interrogated. <u>Morris</u>, 209 Ill. 2d at 157. Although the giving of the warnings is not enough, standing alone, to purge the taint of a defendant's illegally obtained statement, the giving of the warnings weighs in favor of a finding of attenuation. <u>People v. Jennings</u>, 296 Ill. App. 3d 761, 764 (1998). In the instant case, the State clearly established that defendant was given <u>Miranda</u> warnings prior to making his oral and written statements at the police station. Accordingly, we find that this factor supports a finding of attenuation.

The next factor to be considered is the presence of intervening circumstances that served to purge the defendant's subsequent statements of the taint of the prior police misconduct. <u>Morris</u>, 209 Ill. 2d at 157. As a general rule, confronting a suspect with illegally obtained evidence tends to induce a compelled statement by demonstrating the futility of remaining silent. <u>People v. Turner</u>, 259 Ill. App. 3d 979, 991 (1994). However, the confrontation of a defendant with new, legally obtained information is one possible intervening circumstance that may produce a voluntary desire to make a statement to the police and, thereby, weighs in favor of a finding of attenuation. <u>Jennings</u>, 296 Ill. App. 3d at 766.

In the present case, the record establishes that, rather than confronting defendant at the police station with any new, legally obtained information, Holman confronted him with questions formed from and based upon the very information he illegally obtained at the hospital. While Holman did not testify as to the specific questions he asked defendant at the police station, Buckingham did.

-23-

During the suppression hearing, Buckingham testified that Holman asked defendant questions relating to the possibility that defendant might lose his children, relating to the victim's relationship with defendant's wife, and relating to the victim "ruining" defendant's life and marriage. Buckingham testified that such questioning could not have been based on information obtained during the police station interrogation or during the interview of the victim at the hospital. Indeed, Buckingham was with Holman during the entire interview with the victim at the hospital and during the entire police station interrogation of defendant. Yet Buckingham testified that he did not know the source of the information from which Holman formulated his questions. Buckingham also agreed that at no time during the police station interrogation did defendant say that his "life is in shambles," as indicated in Holman's typewritten summary of defendant's statement.

We also note the inconsistency in Holman's testimony. At the suppression hearing, Holman testified that, after defendant became visibly upset and began to cry, defendant made six inculpatory statements: (1) the victim had "ruined his life, his soul, and his marriage"; (2) defendant and the victim had been coworkers and friends; (3) defendant suspected the victim of sleeping with defendant's wife; (4) defendant had been to the victim's apartment that evening; (5) defendant was worried about losing custody of his children; and (6) defendant said "everything is going to be downhill from here." Holman also testified at the hearing that defendant responded with all of those statements after Holman asked one question, "if he was okay, what was wrong." At trial, however, Holman testified that he asked defendant "[w]hat was wrong, if he was okay." Holman testified that defendant answered with one statement, that the victim had ruined his life. Holman then encouraged

defendant to expand on that statement, asking him "what he meant by that." Holman testified, "Defendant said [the victim] 'ruined my life, my soul, and my marriage' and that's all he would say." The other five inculpatory statements were not included in Holman's trial testimony. We find the trial court's determination that both Holman's and Buckingham's testimony was credible to be against the manifest weight of the evidence, as both officers' versions cannot be true. Pitman, 211 Ill. 2d at 512. Rather, we believe that the evidence clearly reveals that Holman's questioning of defendant at the police station was directly predicated upon the statements illegally obtained at the hospital. Holman's use of defendant's illegally obtained statements was an improper attempt to induce a compelled statement by demonstrating the futility of remaining silent. See Turner, 259 Ill. App. 3d at 991. Therefore, we find that this factor strongly supports a finding of no attenuation.

The third factor to be considered is the proximity in time between the illegal police action and the subsequent statements. Morris, 209 Ill. 2d at 157. Courts have noted that a significant passage of time between an illegal police action and the making of a subsequent statement is an "ambiguous factor," which "may serve to amplify the coercion latent in [a] custodial setting, particularly where there are other indicia of coercion" or, on the other hand, "may help to purge the taint of a prior illegality by allowing an accused to reflect on his situation, particularly when attended by other factors ameliorating coercion, such as Miranda warnings" having been administered. People v. Lekas, 155 Ill. App. 3d 391, 414 (1987). In the present case, the trial court found that the written statement defendant gave at the police station was made at approximately 5:30 a.m. The State presented evidence that defendant was questioned at the hospital between 1:30 a.m. and 1:45 a.m.

-25-

Defendant was then transported to the police station, where his interrogation commenced at approximately 4:30 a.m. Although three hours elapsed between defendant's statements at the hospital and the resumption of questioning at the police station, this delay was necessitated by defendant's medical treatment. Upon the resumption of questioning at the police station, defendant was immediately confronted with the statements he made at the hospital. Holman's use of these illegally obtained statements immediately upon defendant's arrival at the police station is an "indici[um] of coercion" that, as previously discussed, weighs in favor of finding no attenuation. See Turner, 259 Ill. App. 3d at 991; Lekas, 155 Ill. App. 3d at 414.

The final factor to consider is the purpose and flagrancy of the police misconduct. Morris, 209 Ill. 2d at 157. Here, Holman approached defendant after he had been transported to the emergency room for treatment of a gunshot wound and had been in custody for an hour and a half. Holman did not inquire into defendant's medical status or seek the permission of defendant's attending medical personnel to speak with defendant. Holman did not ask if defendant had been medicated, but Holman acknowledged that defendant's wound had not been treated and that defendant was still bleeding. Holman questioned defendant even after defendant affirmatively said that he did not know where the gun was and until defendant became visibly upset and began to cry. Rather than ending the questioning at that point or giving defendant Miranda warnings, Holman began to question defendant about his mental state. Later, at the police station, Holman exacerbated the impropriety of his conduct by using the information he improperly obtained earlier to form the questions that would elicit evidence of motive, after Miranda warnings had been given. Based upon

-26-

the record before us, we conclude that the police misconduct in this case was flagrant and carried out for an improper purpose. See generally People v. Bowman, 335 Ill. App. 3d 1142 (2002) (finding police misconduct in obtaining a statement overcame defendant's free will and therefore the statement could not be deemed voluntary). Accordingly, we find that this factor strongly supports a finding of no attenuation.

Having found that only one of the four factors supports a finding of attenuation, and that the other three strongly support a determination that the police station statements were not sufficiently attenuated from the illegally obtained hospital statements, we conclude that the trial court erred in finding that the statements made at the police station were voluntarily given after a knowing and intelligent waiver of defendant's rights. See White, 117 Ill. 2d at 222; Laliberte, 246 Ill. App. 3d at 166. Therefore, we conclude that the trial court erred in denying defendant's motion to suppress all of defendant's police station statements as fruit of the poisonous tree. See White, 117 Ill. 2d at 222; Laliberte, 246 Ill. App. 3d at 166.

We next consider the prejudicial impact of the trial court's erroneous rulings. Admission of illegally obtained evidence at trial does not always necessitate a retrial. See People v. St. Pierre, 122 Ill. 2d 95, 113 (1988). If the trial court's error was harmless, the jury's verdict will stand. St. Pierre, 122 Ill. 2d at 114. For an error to be considered harmless, we must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. St. Pierre, 122 Ill. 2d at 113-14. We must review the facts of the case and the evidence at trial to determine what effect, if any, the

unlawfully admitted evidence had upon the other evidence adduced at trial and upon the attorneys' conduct and arguments to the trier of fact. See St. Pierre, 122 Ill. 2d at 114.

In the present case, the jury was presented with directly conflicting testimony as to whether defendant or the victim was the initial aggressor. The illegally obtained statements probative of defendant's motive clearly impacted upon defendant's credibility. Furthermore, throughout the trial, both the defense and the State made specific reference to the improperly obtained statements. Indeed, the State argued extensively in closing that the jury should pay particular attention to defendant's written statement regarding defendant's belief that his wife and the victim were having an affair and how that had ruined defendant's life and his marriage. Under the circumstances of this case, we are unable to find beyond a reasonable doubt that defendant's illegally obtained statements did not contribute to his conviction. As such, defendant is entitled to a new trial. See St. Pierre, 122 Ill. 2d at 115. Nevertheless, we note that we have reviewed the evidence introduced at trial and determined that it was sufficient to support a finding of defendant's guilt beyond a reasonable doubt. Accordingly, defendant will not be subjected to double jeopardy on remand. See People v. Taylor, 76 Ill. 2d 289, 309 (1979).

Although we are remanding this case for a new trial, we elect to address defendant's second contention, as it is likely to arise at retrial. See People v. Grano, 286 Ill. App. 3d 278, 289 (1996). Defendant contends that the trial court abused its discretion in denying his motion in limine to allow the introduction of evidence of the victim's propensity and reputation for violence and aggressiveness. Defendant also contends that the trial court abused its discretion in sustaining the

State's objections to his attempts to elicit such evidence during his examination of the witnesses at trial. Defendant argues that such evidence is probative to show that the victim was more likely the initial aggressor and to show defendant's state of mind in defending himself against the victim's attack upon him. Specifically, defendant sought to introduce evidence in three areas: (1) defendant wanted to question the victim and the victim's wife and to testify as to his own knowledge about a domestic violence complaint filed by the victim's wife against the victim; (2) defendant wanted to question the victim and to testify as to his own knowledge as a witness to a physical altercation between the victim and another coworker at Comcast; and (3) defendant wanted to testify as to his knowledge of the victim's reputation among his coworkers as violent and aggressive.

As correctly noted by the State, defendant failed to make an offer of proof below as to the specific evidence he sought to admit. Lacking such an offer of proof, we cannot review the propriety of the trial court's ruling to exclude the evidence. See People v. Thompkins, 181 Ill. 2d 1, 9-10 (1998). However, we do note that in ruling on the motion in limine, the trial court was under the mistaken belief that there is no legal precedent for allowing propensity evidence of the victim.

Where a defendant raises self-defense as an affirmative defense and presents some evidence in support of the defense, evidence of the victim's violent or aggressive character may be admissible to show the circumstances confronting the defendant, the extent of the apparent danger, and the motive or state of mind by which the defendant was influenced. People v. Davis, 29 Ill. 2d 127, 129-30 (1963). More specifically, a victim's aggressive and violent character may be admissible to support a theory of self-defense in two ways. People v. Lynch, 104 Ill. 2d 194, 199-200 (1984).

First, the defendant's knowledge of the victim's tendencies for violence necessarily affects his state of mind in the perception of and reaction to the victim's behavior. Lynch, 104 Ill. 2d at 200. Therefore, deadly force that may be unreasonable in an altercation with a nonviolent person may be reasonable in response to the same behavior by a person known to have violent and aggressive tendencies. Lynch, 104 Ill. 2d at 200. The defendant's knowledge of the victim's character is necessary for evidence of this nature to be probative and admissible. Lynch, 104 Ill. 2d at 200.

Second, where there are conflicting accounts as to who the initial aggressor was in a confrontation, evidence of the victim's propensity for violence and aggressiveness may be admissible to support the defendant's version of the facts. Lynch, 104 Ill. 2d at 200. In other words, this type of evidence is probative to assist the trier of fact in judging the credibility of the witnesses and to provide the trier of fact with a more complete picture of what occurred. Lynch, 104 Ill. 2d at 200.

In the instant case, defendant first raised his affirmative defense of self-defense and presented some evidence tending to support that theory at a pretrial status hearing on October 29, 2003. Accordingly, appropriate evidence of the altercation between the victim and a coworker and of the victim's reputation among his coworkers may have been relevant to show defendant's state of mind in the perception of and reaction to the victim's behavior. Lynch, 104 Ill. 2d at 200. Such evidence may also have been relevant to show that defendant responded with a reasonable amount of force in defending himself against the victim. Lynch, 104 Ill. 2d at 200. Finally, such evidence may have been probative to assist the trier of fact in judging the credibility of defendant's version of the events, especially absent the unlawfully obtained motive evidence as previously discussed. Given the

conflicting testimony of defendant and the victim as to who the initial aggressor was, the propensity evidence may have provided the trier of fact with a more complete picture of what really occurred. Lynch, 104 Ill. 2d at 200. Of course, all of the normal rules of evidence as to admissibility of the reputation and propensity evidence apply. See Lynch, 104 Ill. 2d at 200-01. Therefore, even if the propensity evidence discussed above may be relevant to defendant's theory of self-defense on remand, defendant must establish that the evidence is otherwise admissible. See Lynch, 104 Ill. 2d at 200-01.

As to the evidence of the domestic battery complaint in the instant case, we note that as a general rule, evidence of an arrest without a conviction is insufficient to establish that a victim has a reputation for violence and aggressiveness, as an arrest alone does not establish that the person arrested actually performed the acts charged. People v. Huddleston, 176 Ill. App. 3d 18, 28-29 (1988). The record reflects that the victim in the present case was not convicted of the domestic battery charge. As previously discussed, defendant failed to make an offer of proof below as to the specific evidence he sought to introduce related to the victim's reputation and propensity for violence and aggressiveness. If defendant wishes to present this propensity evidence on remand, it will be left to the sound discretion of the trial court as to whether the proffered evidence is admissible. People v. Enis, 139 Ill. 2d 264, 281 (1990).

Having determined that defendant is entitled to a new trial, we need not address defendant's final contention, that he is entitled to two additional days' credit against his sentence for time spent in pretrial custody.

For the foregoing reasons, we vacate defendant's convictions and sentence, and we remand the case for a new trial.

Reversed and remanded.

McLAREN, J., concurs.

JUSTICE KAPALA, specially concurring:

I agree with the majority's conclusion that the State failed to carry its burden of establishing by a preponderance of the evidence that the inculpatory statements defendant made at the hospital were voluntary under the fifth amendment. Thus, those statements are inadmissible. I also agree that there was insufficient attenuation to break the causal chain, such that defendant's subsequent station house inculpatory statements came from the "exploitation of that illegality" and not "by means sufficiently distinguishable to be purged of the primary taint" (Wong Sun, 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417). Thus, those statements were also inadmissible. I write separately because I do not concur in the majority's analysis of the Quarles public safety exception to the rule stated in Miranda. In my view, such analysis is unnecessary to the resolution of this appeal.

Failure to administer the prophylactic Miranda warnings results in a presumption that unwarned statements are involuntary and does not carry the same consequence as actual police infringement of an individual's constitutional privilege against compulsory self-incrimination. This concept was made clear in Oregon v. Elstad, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985):

> "If errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension

of <u>Miranda</u> to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though <u>Miranda</u> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." <u>Elstad</u>, 470 U.S. at 309, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.

In short, it is the fruits of a violation of a constitutional right (not just of the prophylactic standards set forth in <u>Miranda</u>) that are suppressed under the "fruits" doctrine. In this case, once we conclude that the State failed to demonstrate that the statements defendant made at the hospital were voluntary under the fifth amendment, we need not concern ourselves with any purported violation of the rule stated in <u>Miranda</u>. The fifth amendment violation, together with a lack of sufficient attenuation, supports the suppression of the statements at the hospital as well as the statements made at the police station. A <u>Miranda</u> violation would support the suppression of only the statements defendant made at the hospital and not the statements he made at the police station. Thus, the majority's analysis of the <u>Quarles</u> exception to <u>Miranda</u> is unnecessary to reach our conclusion that all of defendant's statements should have been suppressed.

Moreover, the majority's fruits-doctrine analysis does not distinguish between an illegality in the form of a violation of a constitutional right and an illegality in the form of a violation of <u>Miranda</u>. As a result, the majority opinion could serve to confuse the bench and the bar by

improperly suggesting that a <u>Miranda</u> violation can serve as the poisonous tree, the fruit of which, absent sufficient attenuation, is inadmissible at trial.

For the foregoing reasons, I would reverse defendant's convictions and remand for a new trial under the exclusive rationale that the inculpatory statements defendant made at the hospital were inadmissible under the fifth amendment and the inculpatory statements he made thereafter were the inadmissible fruit of that constitutional violation.