2022 IL App (4th) 200481

NO. 4-20-0481

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| MICHAEL F. HENSLICK, | ) | No. 18CF1212 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jason Matthew Bohm, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1 In the Champaign County circuit court, a jury found defendant, Michael F. Henslick, guilty of the first degree murder of Holly Cassano. See 720 ILCS 5/9-1(a)(1) (West 2008). The court sentenced him to natural life imprisonment. He appeals on three grounds.

¶ 2 First, defendant argues that the circuit court "erred by denying [his] motion to suppress his involuntary statements to [the] police." We disagree with the premise of that argument. Defendant's statements were voluntary. He made a valid waiver of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and afterward the police did nothing to critically impair his capacity for self-determination.

¶ 3 Second, defendant argues that the State failed to prove, beyond a reasonable doubt, the aggravating factor upon which the sentence of natural life imprisonment was based, that the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton

cruelty" (730 ILCS 5/5-8-1(a)(1)(b) (West 2008)). Viewing all of the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that aggravating factor to be proven beyond a reasonable doubt.

¶ 4　　　Third, defendant argues that "[t]he sentencing court erred by considering an unproven and unalleged sexual assault in fashioning [his] sentence." Again, we disagree with a premise of that argument. Sexual assault is a reasonable inference from the evidence. The reason why defendant murdered Holly, it could be further inferred, was to escape liability for sexually assaulting her. As for "alleging" sexual assault, we are unaware of any authority requiring the State to specifically do so. Proving the facts from which sexual assault could be reasonably inferred should be a sufficient "allegation."

¶ 5　　　Finding no merit in any of those three arguments for reversal, we affirm the judgment.

¶ 6　　　　　　　　　　　　I. BACKGROUND

¶ 7　　　On November 1, 2009, around 11 p.m., after finishing her shift at Meijer grocery store in Champaign, Illinois, Holly Cassano, age 22, drove home, to Mahomet, Illinois. She had promised to be at the residence of her mother, Toni Cassano, by 9 a.m. the following day. After Holly did not show up and did not answer her phone, Toni went to Holly's mobile home. The door to the trailer was unlatched. Toni went in and found Holly dead on the bedroom floor. Holly was lying face upward. She was naked except for a camisole or bra pulled up above her breasts and a pair of panties, with a severed strap, pulled down over her left thigh.

¶ 8　　　A coroner's forensic pathologist, Dr. Scott Denton, testified that, in the autopsy that he performed on Holly's body, he counted 55 to 60 stab wounds, some of which had pierced her heart, lungs, liver, and one of her kidneys. She had been stabbed in the chest and in the back. Most

of the stab wounds were clustered on her back. Dr. Denton opined that she had bled to death in three to seven minutes after receiving her mortal wounds. From the incisions on Holly's right arm and hand, he inferred that she had resisted her assailant, trying to block the knife blows. Dr. Denton found no vaginal or oral tearing. In his experience as a forensic pathologist, however, torn and displaced panties and a rolled-up top were suggestive of sexual assault.

¶ 9    Semen and a man's blood were found on Holly's body. The Champaign County Sheriff's Department approached men who had had any association with Holly or who had lived in her neighborhood, asking if they would give a DNA sample. Most agreed to do so. The police collected more than 150 DNA samples, but none of the volunteered samples matched the male DNA found on Holly's body.

¶ 10    The police obtained a DNA sample from defendant by following him and picking up cigarette butts he had thrown down. On August 28, 2018, the crime laboratory determined that the DNA on the cigarette butts was a match for the male DNA found on Holly's body. More precisely, the odds that the male DNA on Holly's body was not defendant's DNA were so vanishingly low that the DNA had to be regarded as defendant's.

¶ 11    Therefore, the police arrested defendant for Holly's murder and took him to the interrogation room of the police station. After advising him of his *Miranda* rights, which he acknowledged understanding, the police interrogated him for five hours, asking him at least 66 times why he had killed Holly. He kept denying that he did so.

¶ 12    At no time during the interrogation did defendant request an attorney or state unequivocally that he wanted an attorney. When he raised the possibility of retaining an attorney, the interrogators allowed him to take a cigarette break and a bathroom break. They told defendant

that, although he had the right to an attorney, it did not follow that an attorney would be provided "in a timely manner."

¶ 13    The police had arrested defendant around the supper hour, before he had a chance to eat. In the interrogation room, he was provided drinking water. During the interrogation, he requested a hamburger, which the interrogators assured him would "absolutely" be provided to him. He asked the interrogators if they, too, were going to eat. They answered that they had already eaten, whereupon defendant said that he would put off eating. Later in the interrogation, he requested a hamburger again and was assured that a hamburger was "in the works." No food, however, was provided to defendant, and the interrogation continued.

¶ 14    The interrogators told defendant that he would have to answer to a judge but that he would be given the benefit of the doubt if he provided a "reasonable explanation" for killing Holly. They warned him that if he did not divulge why he had killed Holly, the trier of fact would hold the lack of an explanation against him and there would be a "horrible ending."

¶ 15    The interrogators kept urging defendant to say he was sorry. They asked him where it started. He replied that he did not know where anything started. They advised him that, usually, it would matter to the outcome "in a better way" if one told the truth. On the other hand, the police advised defendant that confessing might not change where he ended up but that confessing would give him peace.

¶ 16    Finally, after defendant's many denials, Investigator Dwayne Roelfs slammed a binder on the table. He told defendant that whereas Holly's daughter was only 10, he, defendant, was 30—"a big boy"—and that Roelfs was "sick of sitting [t]here and listening to a bunch of bulls*** coming out of [defendant's] mouth." It was time for defendant to "stand up[ ] and be a man," Roelfs exhorted him. Again Roelfs asked him whether he had killed Holly. This time,

defendant answered that he was "sorry" and that he had indeed killed Holly. Roelfs asked him how he had killed her. Defendant answered that he had stabbed her. Roelfs asked him where he had stabbed her. All over her torso, defendant answered.

¶ 17　　　　Defendant told the interrogators that he went over to Holly's trailer to talk to her and that they had consensual sex. After having sex, they fell asleep. Defendant woke up and began stabbing Holly while she was still asleep. She awakened, asking " [']What[?'] " and she cried for help. After killing Holly, defendant went into the kitchen to find a cloth to wipe the blood off himself. He threw away the knife in the country.

¶ 18　　　　Defendant, however, denied raping Holly. The investigators tried to get him to admit to raping her, but he steadfastly denied doing so. He thought that, in addition to having consensual intercourse with her before killing her, he might have had intercourse with her corpse.

¶ 19　　　　He gave various explanations for killing Holly. He said that maybe the reason he killed her was that he was jealous and that he wanted to be with her cousin, whose name was Amber (last name unspecified). Also, he said he killed Holly because he was drunk and emotional and because he "lost" himself. When asked what made him so angry, he answered, "I think I was just angry about it all."

¶ 20　　　　The jury found defendant guilty of the first degree murder of Holly Cassano. The jury further found that the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (*id.*).

¶ 21　　　　In the sentencing hearing, the circuit court explained why it had decided to sentence defendant to natural life imprisonment. One reason was the way in which Holly had died: a "sadistic, brutal, unrestrained attack that left her with 55 to 60 stab wounds primarily over her upper body." The court continued:

"It is also clear that she was sexually assaulted. [Defendant] gave an explanation after he was confronted with the DNA results and was being interviewed by the investigators and officers of the [s]heriff's [d]epartment, and he claimed that the first encounter with [Holly] was consensual. And this Court finds that that strains all credulity under the evidence and the facts before it. He also confessed that his second sexual encounter with her was with her body after murdering her, with her dead body. That defies all standards of humanity. The magnitude of the rage that he unleashed on her that day is difficult to fathom. And the jury agreed when it made its finding after being given the definition of what goes into that finding. The defendant's acts were calculated to inflict the maximum amount of pain and suffering as Holly fought for her life."

Finding that the community needed to be protected from defendant, the court sentenced him, pursuant to section 5-8-1(a)(1)(b) of the Unified Code of Corrections (*id.*), to serve the rest of his natural life in prison. Afterward, the court denied a motion by defendant to reduce the sentence.

¶ 22                                    II. ANALYSIS

¶ 23                    A. The Voluntariness of Defendant's Confession

¶ 24            Invoking both the due process clause of the United States Constitution (U.S. Const., amend. XIV) and the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), defendant argues that, regardless of whether a confession is true or false, "[a] person is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession."

¶ 25            The United States Supreme Court deems the admission of an involuntary confession into evidence against a defendant to be a violation of the due process clause of the

federal constitution (U.S. Const., amend. XIV). *People v. Richardson*, 234 Ill. 2d 233, 252 (2009); *People v. Strader*, 38 Ill. 2d 93, 94-95 (1967). Defendant assumes that the admission of an involuntary confession likewise would violate the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). We are unaware, however, of any decision that has so interpreted the due process clause of our constitution (Ill. Const. 1970, art. I, § 2). Rather, the Illinois Supreme Court has held that the Illinois constitutional provision that is violated by the admission of an involuntary confession is article I, section 10 (Ill. Const. 1970, art. I, § 10), which provides, "No person shall be compelled in a criminal case to give evidence against himself ***." *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005).

¶ 26 A confession is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." (Internal quotation marks omitted.) *Richardson*, 234 Ill. 2d at 253. A confession is involuntary if the defendant's "will has been overborne" and his or her "capacity for self-determination critically impaired." (Internal quotation marks omitted.) *Id.* In deciding whether a confession was voluntary, "a court must consider the totality of the circumstances of the particular case," and "no single factor is dispositive." *Id.* The *Richardson* court specified:

> "Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises." *Id.* at 253-54.

¶ 27 Defendant gives five reasons why, under the totality of the circumstances, his confession should be regarded as involuntary.

¶ 28       First, defendant argues that the police "[m]anipulated him out of requesting counsel" by (a) telling him that, although he had a right to have an attorney present during questioning, an attorney would not be provided "in a timely manner" and (b) "distracting" him with a cigarette break and a bathroom break when he raised the question of whether he should have a lawyer present.

¶ 29       To further quote from defendant's brief, however, he "never unambiguously requested counsel." For that reason alone, the case that defendant cites in this context, *People v. Schuning*, 399 Ill. App. 3d 1073, 1088 (2010), is distinguishable. In *Schuning*, the appellate court observed that, under binding case law, an arrestee's unambiguous request for an attorney must end the interrogation. *Id.* at 1081-82. If a defendant who is "in custody and [who is] subject to interrogation or under imminent threat of interrogation" makes a "statement that can reasonably be construed to be an expression of a desire for the assistance of counsel," the interrogation must stop (or not begin) unless the defendant, after expressing such a desire, "initiates further communication, exchanges, or conversations with the police." *Id.* at 1082. After the defendant in *Schuning* requested to call an attorney, he should not have been interrogated. The statements he made in the ensuing interrogations were rightly suppressed. *Id.* at 1090. The *Schuning* defendant's request to call his attorney was unambiguous and should have cut off any questioning. See *id.* at 1086.

¶ 30       In the present case, by contrast, defendant admits that he never unambiguously requested to consult with an attorney. *Schuning*, therefore, would suggest that the police were entitled to proceed with their interrogation of defendant. The appellate court said in *Schuning*, "If a defendant makes a reference to an attorney that is ambiguous or equivocal such that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking

the right to counsel, our precedents do not require the cessation of questioning." (Emphasis in original and internal quotation marks omitted.) *Id.* at 1082.

¶ 31    In short, rather than request an attorney, defendant merely raised the question of whether he needed an attorney. *Schuning*, therefore, tends to validate the continued interrogation. See *id.* In *Schuning*, we see no language forbidding the police to "manipulate" or "distract" an arrestee during an interrogation. *Cf. Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (holding that "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns"). Nor do we see any language in *Schuning* that would prohibit the police from remarking (probably accurately) that getting a defense attorney appointed would take time. Granted, such a remark could be characterized as manipulative in that it apparently was calculated to persuade defendant to make a statement right away and thereby clear this matter up as soon as possible instead of slowing down the process by requesting an attorney. Generally, however, merely talking the arrestee into confessing, using conversational methods of rational persuasion, does not overpower the arrestee's will. The arrestee's will may be influenced and maybe even cajoled, but it is not overpowered. "A confession need not be spontaneous, nor is it necessary that it proceed wholly at the suggestion of the accused in order to be voluntary." *People v. Vinci*, 295 Ill. 419, 425 (1920). "Manipulation" here seems to be a pejorative term for talking defendant into confessing.

¶ 32    There was, indeed, a lot of talking—an observation that brings us to defendant's second argument. He argues that his confession was involuntary in part because the police interrogated him for over five hours, asking him at least 66 times why he killed Holly. He admits that "five hours of interrogation, [considered] in isolation, is not coercive." Nevertheless, he argues that "being asked the same question over and over again becomes more coercive the longer it goes

on." Citing *People v. Dennis*, 373 Ill. App. 3d 30, 46 (2007), he observes that "[e]ven as little as [10] minutes can be a 'significant' amount of interrogation time where the same question is asked over and over again."

¶ 33    *Dennis*, however, is distinguishable in that the police subjected the defendant in that case to custodial interrogation in the hospital without giving him the *Miranda* warnings. See *id.* at 42. The appellate court held that, "[u]nder *Miranda*, a statement taken from a defendant is inadmissible in the State's case unless the State demonstrates, by a preponderance of the evidence, that the defendant was first given *Miranda* warnings and that the defendant made a knowing and intelligent waiver of his or her privilege against self-incrimination." *Id.* That holding in *Dennis*, it is worth noting, was sufficient to address the issue of the admissibility of the hospital confession. The *Dennis* court's ensuing discussion of *how* the police officer conducted the hospital interrogation, such as by asking the defendant the same question over and over again, seems to us a *dictum*, unnecessary to the resolution of the issue. See *id.* at 46. *Dictum* aside, a police officer's asking the same question over and over again in the inherently coercive environment of custodial interrogation might well make the voluntariness of a confession questionable. *Miranda* warnings, however, dispel the inherent coerciveness of custodial interrogation because the defendant knows that, no matter how many times the police officer repeats a question, the defendant has the right to remain silent. See *Moran v. Burbine*, 475 U.S. 412, 427 (1986). Defendant in this case was advised of his *Miranda* rights, and he waived them, making *Dennis* distinguishable.

¶ 34    Granted, *Miranda* warnings are not dispositive. They are only one factor for a court to consider in deciding whether the confession was voluntary. See *Richardson*, 234 Ill. 2d at 253-54. When the Illinois Supreme Court describes an involuntary confession, however, as a confession made as a result of the defendant's "will" being "overborne" (*People v. Murdock*, 2012

- 10 -

IL 112362, ¶ 30), it is worth noting where this overbearing-of-the-will language comes from. The language ultimately comes from pre-*Miranda* cases decided by the United States Supreme Court in which the defendants had buckled under the unremitting pressure of relay interrogations, which—because *Miranda* was not yet in existence—the defendants had been powerless to stop. See *People v. Price*, 24 Ill. 2d 46, 54 (1962) (citing, among other authorities, *Culombe v. Connecticut*, 367 U.S. 568 (1961), *Reck v. Pate*, 367 U.S. 433, 440 (1961), and *Watts v. Indiana*, 338 U.S. 49, 52 (1949)). After *Miranda*, arrestees are less vulnerable to mental torture through "the suction process of interrogation" (*Watts*, 338 U.S. at 53), for now all arrestees have to do is "indicate[ ] in any manner" that they "wish[ ] to remain silent," whereupon the interrogation must cease. (Internal quotation marks omitted.) *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. Or, alternatively, they need only request an attorney, and the interrogation must cease until the attorney arrives. *People v. Jeffers*, 365 Ill. App. 3d 422, 427 (2006). In *Watts*, Justice Frankfurter wrote that "[p]rotracted, systematic and *uncontrolled* subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confessions is subversive of the accusatorial system" and that it is, instead, "the inquisitorial system *without its safeguards*." (Emphases added.) *Watts*, 338 U.S. at 55. Since then, controls and safeguards have been installed—in the *Miranda* decision.

¶ 35        We do not mean to suggest that *Miranda* is, in all circumstances, a panacea to overbearing interrogation that, "like the constant dropping of water upon a rock," "finally [wears] through [an arrestee's] mental resolution of silence." *Vinci*, 295 Ill. at 426. After giving an arrestee the *Miranda* warnings, the police could subvert them by making the arrestee too scared to exercise the right to remain silent. "Although the giving of the *Miranda* warning does not, *ipso facto*, render a subsequent confession admissible [citation], an accused's knowledge of his right to remain silent,

his right to counsel, and the consequences of making an admission is part of the totality of the circumstances to be considered." *People v. Noe*, 86 Ill. App. 3d 762, 765 (1980). In the present case, we are hard put to find any circumstance that would have negated or reduced the efficacy of the *Miranda* warnings. Given defendant's knowledge that he could exercise his right to remain silent at any time and that he could request an attorney at any time, it seems implausible that the five hours of interrogation and the numerous exhortations to tell the truth "drained his capacity for freedom of choice." *Culombe*, 367 U.S. at 576.

¶ 36    Third, defendant complains that the police "deprived [him] of food during his interrogation." On the authority of *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010), he argues that "[f]ood deprivation is a coercive tactic." In *Berghuis*, the Supreme Court noted that food deprivation was a "fact[ ] indicating coercion." *Id.* For authority, the *Berghuis* court cited a footnote in *Colorado v. Connelly*, 479 U.S. 157 (1986), that read as follows:

> "*E. g.*, [Citation]; *Greenwald v. Wisconsin*, 390 U. S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); [Citation]; *Davis v. North Carolina*, 384 U. S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate*, 367 U. S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); [Citation]; *Payne v. Arkansas*, 356 U. S. 560 (1958) (defendant held incommunicado for three days with little food; confession obtained when officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); [Citation]." *Id.* at 163 n.1.

By contrast, causing an arrestee to miss a single meal during a five-hour interrogation cannot reasonably be characterized as coercive. "It is improper for an appellate panel to imply a 'square meal' requirement into its analysis of whether an inculpatory statement was made voluntarily." *Nicholas*, 218 Ill. 2d at 119 n.2; *cf. Hall v. Beckstrom*, 563 F. App'x 338, 350 (6th Cir. 2014) (finding that "missing a single meal is not enough to render a *Miranda* waiver involuntary"). The police never threatened defendant with starvation unless he confessed. They never even threatened to deprive him of a single meal. They never told him, "No confession, no hamburger." Rather, they assured him, unconditionally, that a hamburger was "in the works."

¶ 37        Fourth, defendant contends that the police made him promises of leniency by telling him the following:

> "(1) that[,] while he would have to answer to a judge[,] that he would be given the benefit of the doubt if he came up with a 'reasonable explanation' for killing Holly[;] (2) that if he did not say he was sorry for killing Holly, there would be a 'horrible ending[ ]'[;] and, implicitly, (3) that the eventual trier of fact would hold it against him if he did not tell the police why he killed Holly."

Let us set aside the question of how acting in reliance on a promise is involuntary or how offering a reward drains the offeree of the capacity for self-determination. In any event, "the use of promises to induce a confession" "does not alone invalidate a confession as a matter of law, but it is a factor to consider in examining the totality of the circumstances." *In re D.L.H.*, 2015 IL 117341, ¶ 76. We need not decide what weight to assign to a promise of leniency, for in the present case there was no such promise. The supposed promise was so nonspecific as to amount to no promise at all. "To constitute a promise of leniency, the statement must be coupled with a suggestion of a specific benefit that will follow if [the] defendant confesses." *People v. Johnson*, 285 Ill. App. 3d 802, 808

(1996). If the benefit that a defendant purportedly will reap from telling the truth is left open-ended instead of being specified, there is no promise of leniency—and hence there is no factor to balance. *Id.* at 809.

¶ 38    The police never *assured* defendant in this case that he would receive any *particular* benefit if he confessed or made a statement. Instead, to quote from defendant's brief, Roelfs told him "that confessing might not change where he would wind up[ ] but [that] it would give him peace." Advising a defendant that, judicially or otherwise, telling the truth would be the most beneficial course of action is not a promise of leniency in return for a confession. See *People v. Hartgraves*, 31 Ill. 2d 375, 381 (1964) (holding that, although a police officer admitted "[telling] the defendant, 'It would go easier for him in court if he made a statement[,]' [t]his [was] in no way [a] direct promise of leniency" but instead was "a mere suggestion of the advisability of making a statement" and "[did] not in itself render a confession involuntary"); see also *Johnson*, 285 Ill. App. 3d at 809 (disagreeing that a confession was rendered involuntary by a police officer's advice to the defendant that, if the defendant told the truth, the judge would see that the defendant had cooperated and might take the cooperation into consideration); *People v. Makes*, 103 Ill. App. 3d 232, 240 (1981) (holding a confession to be admissible even though the police suggested to the defendant that "things may go easier" if she made a statement).

¶ 39    An argument might be made, however, that although the police made no promise of leniency, they coerced defendant, or threatened a punitive sanction again him unless he provided a satisfactory explanation for killing Holly. Unless he made a statement, the police warned him—more specifically, unless he said he was sorry for killing Holly—he would meet a "horrible ending." Unless he explained why he killed Holly, the trier of fact would hold the lack of an

explanation against him. This warning was a threat. Coercion means threatening to impose a penalty for action or inaction—in this case, for the inaction of not making an inculpatory statement.

¶ 40    Even so, to make a confession by a Mirandized defendant coerced and involuntary, the "threat of punitive sanctions" must be "beyond the threat of conviction at a fair trial." Lawrence Rosenthal, *Compulsion*, 19 U. Pa. J. Const. L. 889, 940 (2017). Rosenthal explains:

> "Confronting a defendant with a threat of punitive sanctions if the defendant chooses to plead not guilty and is then convicted at a fair trial, in turn, is consistent with the Due Process Clause, which permits the government to deprive individuals of 'life, liberty, or property,' as long as the deprivation is accompanied by 'due process of law.' " *Id.* at 937.

It is a reality of a fair sentencing hearing that unremorseful defendants who killed arbitrarily tend to be punished severely. A sentencing judge who regards the defendant's deed as inaccessible to the imagination, who can see no rhyme or reason in what the defendant did, is likely to perceive the defendant as someone who holds others' lives to be worthless. To point out this likelihood is merely to point out the truth. If, as case law holds, "[a] confession obtained by deception or subterfuge is not invalid as a matter of law," still less would a confession obtained by truth-telling be invalid as a matter of law. *People v. Wade*, 2021 IL App (1st) 181019-U, ¶ 40 (citing *People v. Melock*, 149 Ill. 2d 423, 450 (1992)).

¶ 41    Fifth, defendant claims that Roelfs "[y]elled at him and belittled him until he confessed." Assuming, for the sake of argument, that "yelling" is not hyperbole, defendant "has not cited any authority finding that the use of profanity and yelling during an interrogation amounted to a threat sufficient to weigh in favor of suppressing a confession." *People v. Macias*, 2015 IL App (1st) 132039, ¶ 63. "A confession is not rendered inadmissible by the mere fact that

- 15 -

it was elicited by questions put by police officers or others, even though the questions assumed the prisoner's guilt and were roughly asked." *Vinci*, 295 Ill. at 425; see *United States v. Santos*, 131 F.3d 16, 19 (1st Cir. 1997) (holding that "the precedents still require some degree of coercion or trickery by government agents to render a statement involuntary" and that "yelling once or twice does not reach this level"). Admittedly, when Roelfs told defendant, condescendingly, that he was "a big boy" and when Roelfs complained to defendant, "I'm sick of sitting here listening to a bunch of bulls*** coming out of your mouth," a reasonable person in defendant's position might well have felt belittled. We are unconvinced, however, that this belittlement was so extreme and sustained as to critically impair defendant's capacity for self-determination. See *Richardson*, 234 Ill. 2d at 253.

¶ 42          B. Exceptionally Brutal or Heinous Behavior Indicative of Wanton Cruelty

¶ 43          Defendant maintains that his sentence of natural life imprisonment is an abuse of discretion because (1) the State failed to prove, beyond a reasonable doubt, that Holly's murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (730 ILCS 5/5-8-1(a)(1)(b) (West 2008)) and (2) the circuit court, in determining the sentence, "consider[ed] an unproven and unalleged sexual assault" of Holly.

¶ 44          Did the State have to specifically "allege" that defendant sexually assaulted Holly before murdering her? Defendant cites no authority to that effect. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring that the argument of a brief include the "citation of the authorities *** relied on"); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) (holding that a point raised in the brief but unaccompanied by a citation to supporting authority is forfeited). On August 20, 2019, the State served upon the defense a notice that the State

"intend[ed] to put before the trial jury in this cause that this murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty as an aggravating factor and as a factor to be proved beyond a reasonable doubt, and [would] seek, upon conviction, a natural life sentence, pursuant to [section 5-8-1(a)(1)(b) of the Unified Code of Corrections (730 ILCS 5/5-8-l(a)(l)(b) (West 2008))]."

On February 14, 2020, the jury found as follows: "[T]he allegation that[,] when the defendant committed the offense of first degree murder[,] the first degree murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty was proven." Thus, after due notice to defendant, the jury was asked to find exceptionally brutal and heinous behavior indicative of wanton cruelty, and the jury so found. Exceptionally brutal and heinous behavior indicative of wanton cruelty is regarded as an element of the offense. See *People v. Callahan*, 334 Ill. App. 3d 636, 648-49 (2002). The question for us on appeal is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found that element to be proven beyond a reasonable doubt. See *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 45          When we view the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that defendant sexually assaulted Holly before murdering her. Defendant admitted having sex with her before murdering her. His DNA was found on her knee and thigh. It would be a natural inference that he murdered her in an attempt to escape criminal liability for sexually assaulting her. Otherwise, the murder would lack any apparent motive. When Roelfs asked defendant over and over again, with increasing frustration, why he murdered Holly, defendant offered a variety of explanations, none of which made sense. He said that he was drunk and emotional and that he "lost" himself. He said that he killed Holly because

he wanted to be with her cousin. He said that he was "just angry about it all." That a man apparently free of psychosis would, for no reason at all, brutally stab a woman to death upon waking up after having consensual sex with her strains credulity. Photographs of Holly's body show her lying on her bedroom floor, on her back, and she is naked except for a bra pulled above her breasts and except for panties, a strap of which appears to be broken, wrapped around her left thigh. Viewing the evidence in a light most favorable to the State entails drawing "all reasonable inferences from the record in favor of the prosecution" (*People v. Eubanks*, 2019 IL 123525, ¶ 95), and it would be reasonable to infer that the sex defendant had with Holly before murdering her was nonconsensual.

¶ 46        Granted, as defendant observes, the autopsy found no evidence of vaginal or anal tearing. That observation would have greater significance, however, if it could be reliably inferred, from the absence of such tearing, that the sexual intercourse had been consensual. We are unaware that any expert opinion was presented on that question.

¶ 47        The only evidence we have that the sex was consensual is defendant's representation that it was consensual—a representation that the jury did not have to believe. The reason why defendant murdered Holly, it could be reasonably inferred, was that she would have called the police and would have reported him for sexually assaulting her. Arguably, sexually assaulting the victim before murdering her satisfies the criterion of "wanton cruelty," which the supreme court has defined as "consciously [seeking] to inflict pain and suffering on the victim of the offense." *People v. Kaczmarek*, 207 Ill. 2d 288, 303 (2003). The number of wounds that defendant inflicted on Holly, without apparent provocation, arguably makes the murder "exceptionally brutal and heinous." See *People v. Hartzol*, 222 Ill. App. 3d 631, 652 (1991). The sexual assault before murdering her added the element of "wanton cruelty."

¶ 48       As defendant points out, the behavior that accompanies a murder can be "exceptionally brutal or heinous" without necessarily being "indicative of wanton cruelty" (730 ILCS 5/5-8-1(a)(1)(b) (West 2008)). See *People v. Nitz*, 219 Ill. 2d 400, 418-19 (2006). The number of wounds and the lack of provocation can make a murder exceptionally brutal or heinous. *Hartzol*, 222 Ill. App. 3d at 652. "Wanton cruelty," however, means "consciously [seeking] to inflict pain and suffering on the victim." *Kaczmarek*, 207 Ill. 2d at 303. It is true, as the State notes, that in *People v. La Pointe*, 88 Ill. 2d 482, 501 (1981), the supreme court held that the infliction of "torture" or "unnecessary pain" was inessential to the statutory phrase "accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty." (Internal quotation marks omitted.) In more recent cases, however, the supreme court has clarified that " '[w]anton cruelty' requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." (Internal quotation marks omitted.) *Nitz*, 219 Ill. 2d at 418; see *Kaczmarek*, 207 Ill. 2d at 303.

¶ 49       Defendant argues that the numerous stab wounds clustered around Holly's vital organs, such as her lungs and heart, evince an intention to kill her as quickly as possible, without inflicting unnecessary pain upon her. As we have discussed, though, sexually assaulting a victim before murdering her shows a desire to inflict pain and suffering on her. But let us assume, for the sake of argument, that we are wrong about the reasonableness of inferring sexual assault. Even so, we conclude that the stab wounds on Holly's arm and face could reasonably be regarded as revealing an intention to inflict pain and suffering on her.

¶ 50       These nonmortal stab wounds look painful, and they are plentiful enough that a reasonable trier of fact could find it implausible that defendant was merely aiming for a vital organ and that he missed over and over again. In People's exhibit No. 6F, we count five stab wounds on

Holly's upper right arm, near her shoulder, and two stab wounds on the inner side of her right arm. In People's exhibit No. 6J, she has stab wounds on her lips, her right nostril is severed, and her left nostril almost is severed. In People's exhibit No. 6K, we count four further stab wounds, somewhat lower on her right arm. One of the wounds is a gaping gash that exposed a tendon of the elbow. People's exhibit No. 6L shows two stab wounds on the fingers of Holly's right hand. These wounds on the arm and hand appear to be defensive wounds, as if Holly had her forearm raised and, by the repeated infliction of severe pain, defendant meant to batter down her defenses. Arguably, this is the work of a man who wanted his victim to feel pain and horror before she died. Under our deferential standard of review, we decline to disturb the jury's finding that defendant's first degree murder of Holly Cassano was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (730 ILCS 5/5-8-1(a)(1)(b) (West 2008)).

¶ 51                                    III. CONCLUSION

¶ 52        For the foregoing reasons, we affirm the circuit court's judgment.

¶ 53        Affirmed.

**No. 4-20-0481**

| | |
|---|---|
| **Cite as:** | *People v. Henslick*, 2022 IL App (4th) 200481 |
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 18-CF-1212; the Hon. Jason Matthew Bohm, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Roxanna A. Mason, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Courtney M. O'Connor, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |