NOTICE
Decision filed 01/05/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 231077-U

NO. 5-23-1077

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 18-CF-1212 |
| | ) | |
| MICHAEL F. HENSLICK, | ) | Honorable |
| | ) | Jason M. Baum, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the denial of defendant's postconviction petition where the circuit court's finding that defendant failed to substantially prove ineffective assistance was sufficiently supported by the record.

¶ 2    Defendant, Michael F. Henslick, appeals the denial of his postconviction petition after a third-stage evidentiary hearing. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4    On November 2, 2009, around 9 a.m., Holly Cassano was found deceased and mostly naked in her home at 298 Dupage, Mahomet, Illinois. Holly incurred 55 to 60 stab wounds, with some piercing vital organs. The forensic evidence showed Holly's blood along with that of a male at the scene, indicating that the offender suffered an injury during the crime. The same man's blood and semen were also found on Holly's body. The testing of the semen found on Holly's body revealed

1

that the contributor of the semen had the same DNA as the contributor of the blood. Despite testing more than 150 DNA samples from men who associated with Holly or lived in her neighborhood, the investigation made no significant progress until August 23, 2019, when police were notified by way of a genetic genealogy report that defendant was the possible contributor of semen and blood in this case. After further investigation, defendant was charged through information on August 29, 2018, with four counts of first degree murder of Holly Cassano (720 ILCS 5/9-1(a)(1), (2) (West 2016)).

¶ 5    Prior to trial, on January 3, 2020, defense counsel filed a motion for a *Frye* hearing to exclude testimony addressing genetic genealogy that was used in this case and led to the development of the defendant as a suspect. Counsel contended that genetic genealogy was not fully accepted within the scientific community. Counsel alternatively argued that evidence of genetic genealogy was more prejudicial than probative under Illinois Supreme Court Rule 403. After the State filed a response indicating it did not intend to introduce direct evidence of the specific results of the Parabon Snapshot Genetic Genealogy report, defense counsel withdrew the motion.

¶ 6    Evidence at trial showed that defendant had a scar on his left arm and wrist. The forensic testing of a buccal swab collected from defendant indicated defendant was the DNA contributor of the male blood and semen found on Holly's body and at the crime scene, with the most conservative estimation being the DNA profile would appear in 1 in 1.6 billion unrelated individuals selected at random. However, the State did not test all of the DNA evidence collected throughout Holly's home, including the fingernail scrapings. Forensic evidence showed that Holly had defensive wounds on her right arm and hand, indicating she fought back.

¶ 7    Evidence further showed that after being arrested and *Mirandized*, police interrogated defendant for over five hours, asking him numerous times why he killed Holly. Defendant initially

2

denied involvement in the death of Holly for hours. Eventually, however, he admitted that he killed Holly, injured his left arm on the same date, and left blood drippings at the crime scene. He further stated he had consensual sexual intercourse with Holly and ejaculated at the time of murder.

¶ 8 The jury found defendant guilty of first degree murder and that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. At the sentencing hearing, defendant maintained his innocence and argued that another man killed Holly and the wound on his arm was more consistent with him getting in between the actual attacker and Holly. He further stated that he blamed himself for her death because he should have called 911 immediately. The trial court sentenced defendant to natural life imprisonment. Defendant's conviction and sentence were affirmed on appeal. *People v. Henslick*, 2022 IL App (4th) 200481, ¶ 52.

¶ 9 On November 25, 2022, defendant, through privately retained counsel, William Wolf, filed a postconviction petition asserting four constitutional errors. After second stage proceedings, the circuit court found that only one claim warranted a third stage evidentiary hearing. That claim involved the potential denial of due process and ineffective assistance of counsel where counsel failed to properly investigate defendant's account of the events so that he could be properly advised on whether to testify at either his pretrial motion to suppress or at trial. For this claim, defendant argued that defense counsel had a duty to advise defendant of his option to testify at the hearing on his motion to suppress instead of advising him not to testify despite failing to consider his narrative that an intruder entered Holly's home and defendant unsuccessfully tried to stop the attacker from killing Holly. He further asserted that the failure to properly investigate his side of the story foreclosed the opportunity to explain to the jury why defendant's DNA would be at the crime scene as well as why defendant made false inculpatory statements during his police

3

interrogation. He concluded that counsel's actions made his decision to not testify unknowing and involuntary and violated his due process and equal protection rights. He also contended that defense counsel provided ineffective counsel in failing to cross-examine the State's forensic scientist, who conduct the DNA testing, in an attempt to obtain a concession that some of the DNA recovered from the scene was defendant's while other DNA evidence was untested. Defendant argued that the errors violated his rights to confront witnesses, cross-examine witnesses, and present a defense. He requested the court to consider the errors individually and cumulatively.

¶ 10    The evidentiary hearing took place on September 26, 2023. Defendant testified that defense counsel did not ask him about his side of the story regarding the interrogation or the murder. He stated defense counsel also failed to inform him that he could testify at the pretrial motion hearing. According to defendant, defense counsel never went into detail about the case or the events of that night and told defendant that "she didn't want to hear it." She also never informed defendant of the details related to her defense of his case. Defendant testified that he did not kill or sexually assault Holly. He stated that, about two weeks prior to trial, defense counsel advised him that he could testify but should not. Defendant testified that he told the court that he did not want to testify because he had never discussed the case with defense counsel and defense counsel never prepared him to testify.

¶ 11    On cross-examination, defendant confirmed that the testimony he wished he would have given during his trial was that there was a mystery third person in Holly's home, defendant was present when the third person murdered Holly, and defendant tried to defend Holly. Defendant stated he did not know the identity of the third person and agreed he had never given a physical description of the person. He agreed that he did not mention the mystery third person during his police interview but stated he told defense counsel. Defendant further stated that defense counsel

told him that she did not want to hear his defenses. He also told defense counsel that he provided false statements during his police interview. Defendant clarified that he tried to tell defense counsel about the details of the night several times, but she did not want to hear it. He agreed he could have told the judge about his desire to tell his side of the story when the judge questioned him about testifying.

¶ 12    The court asked defendant to describe the attacker and defendant stated that he could describe very little because it was completely dark. Defendant further stated the person was male and the attack occurred around 1 or 2 a.m.

¶ 13    Defense counsel, Lindsey Lepp (formerly Yanchus), testified that she went over all of the discovery with defendant and remembered doing so because there was so much discovery that she had to use a cart to transport it. Lepp hoped there would be a way to suppress the DNA identification because police used genetic genealogy, which was a fairly new process to the criminal investigation field. She did "an enormous amount of research on the use of genetic genealogy, the intersection of genealogy and the technology of DNA, and whether or not there was a way to essentially challenge that." Lepp stated that she discussed this strategy with defendant regularly.

¶ 14    She further testified that she went over several possible defenses. She explained that "based on what we know about DNA," it would be difficult to argue defendant was not somehow involved or was not at the crime scene where the results showed with almost certainty that the semen found in Holly's body and blood in her home was defendant's.

¶ 15    Lepp testified that defendant raised the possible defense of a mystery third person or two people who entered the home while he was there and killed Holly. Lepp initially told defendant that due to the severity and seriousness of the case, her preference was that he not provide his

entire story of the events in the case. Instead, she asked defendant role play as if he was testifying at trial and "hypothetically" tell her what happened. Defendant then told counsel about his version of events. He stated that two intruders came through the window, one held him, and the other attacked Holly with a knife. Defendant further stated that he held his arm up defensively and someone slashed his hand. The intruders then dragged defendant throughout the home to intentionally leave defendant's blood all over. Defendant told Lepp that he was in such fear that he did not report the crime to anyone. Lepp explained that she spoke hypothetically because once her clients give their side of the story, she proceeds with that knowledge, which could close off her ability to argue alternative defenses that may be more likely to succeed at trial. Lepp stated she never refused to hear what defendant had to say and was receptive to his suggestions.

¶ 16    Lepp testified that she discussed with defendant whether he should testify at the suppression hearing or not and they decided there would be little value in defendant testifying where the entire interview had been recorded. The State asked if the fact that defendant did not mention the mystery third party killers weighed in her evaluation of whether defendant should testify at the suppression hearing. Lepp said,

> "Because if I had called him to testify at a suppression hearing, one of my
> main concerns would have been limiting the scope of that testimony so that there
> *** wouldn't be a great deal of impeachment that the State could do at—for—
> should he then potentially testify at trial."

She confirmed that she discussed this with defendant as well. Lepp testified that it was not a situation where defendant insisted on testifying and she overrode his decision.

¶ 17    She further stated that she spoke with defendant more in depth about his version of events as they approached trial. She expressed her concern to defendant that his story was not consistent

with the physical evidence and what that would look like to a jury. Specifically, the State had a qualified expert in the science of blood and blood cast off who found that the blood all over Holly's home was not indicative of multiple perpetrators. Lepp further explained, "essentially if there are people physically in a room, there will usually be a void if blood is spurting or being cast off from something and that his findings were essentially that there were not multiple voids indicative of other people being present." The expert also found that blood in the home was not consistent with someone being dragged through it with a wound slowly dripping. Lepp believed when you had two competing versions of what occurred, it was much harder to convince a jury to believe the version that was not supported by the physical evidence. She informed defendant of these concerns in the context of deciding whether he would testify at trial. She believed the best strategy was to present a broad reasonable doubt argument on the basis that no one knew exactly what happened, rather than locking into a specific story. Lepp testified that defendant did not seem anxious to testify, he expressed that he did not want to testify, and she did not prevent him from testifying.

¶ 18    On cross-examination, Lepp agreed none of the genetic genealogy reports or investigations were admitted at trial. She also agreed that the DNA results regarding the semen were consistent with defendant's story but the DNA results regarding the blood was not. Defense counsel asked if Lepp consulted a blood spatter expert, and Lepp stated that she did not. The State objected, arguing that the petition's allegations did not claim counsel should have consulted with a blood spatter expert. Postconviction counsel argued that Lepp claimed the State's blood spatter expert's report was a primary reason why she did not believe defendant's side of the story and so, the workup Lepp completed in making that conclusion was relevant. The court overruled the State's objection. Lepp agreed she had no training in blood spatter. She stated she reviewed the reports authored by the State's blood spatter expert and generally researched the issue to see if she could discredit the

7

science or technology, but she did not conduct an in-depth review of the documentation underlying the information in the report. Lepp could not recall which books or articles she consulted in her research. She agreed that she never prepared defendant to testify to see how he would do but stated he did not seem eager to testify.

¶ 19    Postconviction counsel argued that in cases where the decision to testify cannot be determined before trial and must wait until you know the evidence presented at trial, a reasonable attorney would have completed a mock examination and cross-examination of the client to make an informed decision. Postconviction counsel also contended that defense counsel could have easily consulted with a blood spatter expert or at least tried to obtain the funds for such expert to verify whether the evidence was actually inconsistent with defendant's story.

¶ 20    The State argued defendant's claim that counsel should have requested a blood spatter expert was not in the petition and regardless, defendant failed to establish prejudice for all claims. It noted that defendant presented nothing to suggest anything incorrect in the State's blood spatter report. The State further contended that even if defendant testified at trial, it was more likely to work against him due to the inconsistency with the physical evidence.

¶ 21    The circuit court found defendant's testimony that he told defense counsel his story was inconsistent with the petition's allegation that counsel did not hear any details of his side of the story. The court stated, "There is, however, a good explanation for why his version of events is not consistent with the physical evidence. His version of events is a lie." The court found it odd that defendant could not provide even a general description of the other attackers other than they were male. It determined there were no grounds for counsel to further investigate a claim that there were attackers, which was changed to a singular attacker, and defendant told no one of this story for nine years despite police questioning him about it. The court found counsel did not provide subpar

8

representation. It further held that, even if she did, defendant did not prove prejudice. It said, "some explanations are worse than just remaining silent. This explanation that there were some unnamed, vague attackers who apparently framed him for the murder, didn't leave behind their own DNA evidence but left behind his, is worse than just remaining silent and trying to create reasonable doubt." Defendant appealed, arguing that the circuit court erred in denying his postconviction petition after the third-stage evidentiary hearing.

¶ 22                                    II. ANALYSIS

¶ 23    The Post-Conviction Hearing Act (Act) sets forth a three-stage procedure to be followed in evaluating a petition for postconviction relief. 725 ILCS 5/122-1 *et seq.* (West 2022). For a defendant to be entitled to relief under the Act, he must show that "he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006).

¶ 24    "At the first stage, the trial court must independently review the petition within 90 days of its filing and determine whether it is frivolous or patently without merit." *People v. Addison*, 2023 IL 127119, ¶ 18; 725 ILCS 5/122-2.1(a)(2) (West 2022). Thereafter, if the petition is not summarily dismissed, it must be set for further consideration in the second stage. *Id*. § 122-2.1(b); *Addison*, 2023 IL 127119, ¶ 18. If a defendant makes the required substantial showing that his constitutional rights were violated at the second stage, he is entitled to a third-stage evidentiary hearing. *People v. Domagala*, 2013 IL 113688, ¶ 34. At the third stage, the circuit court determines whether the evidence presented demonstrates that the defendant was, in fact, entitled to relief. *Id.* It is the defendant's burden to make a substantial showing of a constitutional violation at the third stage proceeding. *Pendleton*, 223 Ill. 2d at 473. "At such a hearing, the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the

9

weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Domagala*, 2013 IL 113688, ¶ 34

¶ 25    "After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *People v. English*, 2013 IL 112890, ¶ 23. However, we review *de novo* any pure questions of law, "unless the judge presiding over postconviction proceedings has some special expertise or familiarity with defendant's trial or sentencing and that familiarity has some bearing upon disposition of the postconviction petition." *Id.*

¶ 26    Defendant here contends he made a substantial showing of a constitutional violation where counsel failed to prepare him to testify and presented a defense theory that would conflict with defendant's story. He argues he was left without any meaningful trial defense where the DNA evidence and the scar were left unexplained. We find, assuming *arguendo* that counsel should have further investigated defendant's story, defendant failed to establish prejudice.

¶ 27    To establish his claim that counsel was ineffective, defendant was required to show that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) defense counsel's deficient performance prejudiced the defendant in that, absent such deficient performance, there is a reasonable probability that the result of the trial would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "[A] court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient." *Johnson*, 2021 IL 126291, ¶ 53. "To prevail on a claim of ineffective assistance of counsel based on a failure to investigate, defendant must show that substantial prejudice resulted and that there is a reasonable probability that the final result would have been different had counsel properly investigated." *People v. Orange*, 168 Ill. 2d 138,

10

151 (1995). A reasonable probability means a " 'probability sufficient to undermine confidence in the outcome.' " *Johnson*, 2021 IL 126291, ¶ 54 (quoting *Strickland*, 466 U.S. at 694). Speculation is insufficient, rather a defendant must " 'affirmatively prove' that prejudice resulted from counsel's errors." *Id.* ¶ 55 (quoting *Strickland*, 466 U.S. at 693).

¶ 28    Defendant's argument of prejudice is nothing more than speculation. He does not allege that defense counsel would have found beneficial evidence had counsel further investigated his claim. He also does not contend that his testimony would have reasonably changed the outcome of the pretrial hearing or at trial. Instead, he claims he could not make an informed decision to testify, and the jury could have found him not guilty had it had a full explanation of the events. A violation of the right to make an informed decision does not equate to prejudice by itself. See *People v. Williams*, 2023 IL App (5th) 200195-U, ¶ 34 (citing *People v. Rivera*, 2014 IL App (2d) 120884, ¶ 13); *People v. Hernandez*, 351 Ill. App. 3d 28, 39 (2004). Defendant must show that he would have testified had counsel further investigated and that there is a reasonable probability that his testimony would have changed the result of the proceedings. He fails to make such showing here.

¶ 29    Defendant's silence as to his side of the story for a number of years raises speculation as to its veracity, and his confession provided direct evidence of the offense. Moreover, as provided by Lepp's testimony, defendant's theory conflicted with the forensic evidence of a blood spatter report. While Lepp was not an expert, she researched the issue and found no way to challenge the report. We defer to the court's finding Lepp credible.

¶ 30    Importantly, defendant does not contend the State's report was—in any way—incorrect or could be challenged. Below, he only argued that defense counsel should have obtained an expert to confirm the finding of the State's expert. However, whether that is true or not, defendant has a

11

burden to show the proceedings would have been different had counsel investigated further or obtained a blood spatter expert. *Orange*, 168 Ill. 2d at 151. We do not presume any further investigation would have resulted in a more favorable outcome. See *Johnson*, 2021 IL 126291, ¶ 58 (rejecting notion that courts can presume any further testing would be favorable to a defendant in addressing prejudice for a *Strickland* claim based on the failure to obtain testing). Unless such report was actually challengeable in some way or further investigation would have revealed other supportive evidence, evidence that defendant was the sole offender existed. While defendant's narrative may have provided an innocent explanation for the presence of his semen and blood at the crime scene, his story was not believable given the objective nature of this conflicting evidence. We therefore cannot say there is a reasonable probability that counsel investigating further and defendant testifying to his side of the story would have changed the outcome of either the pretrial hearing or trial. See *Orange*, 168 Ill. 2d at 151-52 (finding where medical evidence did not support his claim and there was no other evidence presented in support of his story, defendant failed to prove prejudice regarding his ineffectiveness of counsel claim based on a failure to investigate defendant's claims of police brutality in obtaining a confession); *Johnson*, 2021 IL 126291, ¶ 58 (finding defendant failed to show prejudice for claim that counsel was ineffective for failing to test DNA found on the gun where there was no indication that the results of such testing would be favorable to the defendant); *People v. Harris*, 2022 IL App (1st) 211236-U, ¶ 23 (same). Accordingly, we find defendant failed to affirmatively establish prejudice, which precludes his ineffective assistance of counsel claim (see *People v. Cherry*, 2016 IL 118728, ¶ 31 (The failure to establish either prong precludes an ineffective assistance of counsel claim.)) and affirm the circuit court's denial of defendant's petition.

¶ 31                         III. CONCLUSION

¶ 32    Defendant failed to substantially show that prejudice resulted from counsel's failure to investigate defendant's side of the story and properly advise defendant of his right to testify at the pretrial hearing. Accordingly, we affirm the denial of defendant's postconviction petition.


¶ 33    Affirmed.